# UNITED STATES BANKRUPTCY COURT
## FOR THE DISTRICT OF COLORADO
### Honorable Howard R. Tallman

| | |
|---|---|
| In re: | ) |
| | ) |
| **ROCKY MOUNTAIN LAND COMPANY LLC,** | ) |
| | ) |
| | ) |
| **Debtor.** | ) |
| | ) **Case No. 12-21643 HRT** |
| | ) **Chapter 11** |
| **CRE/ADC Venture 2013, LLC,** | ) |
| | ) |
| **Movant,** | ) |
| | ) |
| **v.** | ) |
| | ) |
| **ROCKY MOUNTAIN LAND COMPANY, LLC,** | ) |
| | ) |
| | ) |
| **Respondent.** | ) |

## ORDER DENYING PLAN CONFIRMATION AND GRANTING RELIEF FROM STAY

This case comes before the Court on the Debtor's First Amended Plan of Reorganization (docket #131), filed on June 12, 2013, the Objection thereto (docket #140) filed on July 29, 2013, the Motion for Relief from the Automatic Stay (docket #142) filed by Movant[1] on July 31, 2013 (the "Motion"), and the response filed by Debtor on September 16, 2013 (docket #166). The parties stipulated to a full-day evidentiary hearing on both plan confirmation and relief from stay (docket #160), and the hearing was held on November 22, 2013. After reviewing the entire record in the case, the Court is now ready to rule.

---

[1] The Objection and the Motion for Relief from Stay were originally filed by Keycorp Real Estate Markets, Inc. ("Keycorp"), as servicer for the Federal Deposit Insurance Corporation ("FDIC"). On October 17, 2013, Keycorp sold the FDIC assets to CRE/ADC Venture 2013-1 ("CRE/ADC"). On November 19, 2013, CRE/ADC filed a Motion to take Judicial Notice of the sale (docket #178), and an unopposed Notice of Substitution of Parties (docket #179). CRE/ADC also filed amended proof of claim No. 3-4, naming CRE/ADC as creditor, on December 26, 2013.

## I. BACKGROUND

Debtor owns property located at 5690 Webster Street, Arvada, Colorado (the "Property"), a 24,000 square-foot commercial office building built in 2008. Joseph Jehn, a licensed professional engineer, owns and operates Debtor. The Property houses his engineering firm, Jehn Engineering, as well as several other tenants. Bank of Choice, the original lender for three loans on the Property, leased space in the Property until the bank was placed in FDIC receivership in July 2011. The FDIC then began to pursue collection of the loans, which had reached maturity.

Debtor filed its Chapter 11 petition on June 1, 2012. In Schedule A, Debtor valued the Property at $2,200,000.00, with a secured claim against it of $4,123,565.28.[2] Movant's amended proof of claim No. 3-4 is in the total amount of $4,410,856.05, with $4,103,125.00 as secured, based on notes and deeds of trust for the three loans on the Property.[3] In the Motion, Movant states the loans matured on June 2, 2011, with all principal and interest immediately due and payable, and Debtor has failed to make any payments on the loans since that time. Movant began foreclosure proceedings against the Property in early 2012, which were stayed upon the filing of Debtor's bankruptcy.

Movant's first motion for relief from stay on the Property was filed on February 21, 2013. The Court held a hearing on that motion and the Debtor's response on April 24, 2013. At that hearing, the Court heard testimony from Jehn, as well as from Jaimee D. Keene, a Certified General Real Estate Appraiser, and Fran Schneider, a real estate broker and Certified Commercial Investment Member. Both Ms. Keene and Mr. Schneider were acknowledged as expert witnesses by the Court. Ms. Keene testified she valued the Property at a $3,170,000.00 market value in May 2012. Mr. Schneider testified he valued the Property at a $2,200,000.00 market value in February 2013. In their testimony, both experts acknowledged the commercial real estate market had changed since May 2012, although there was some dispute as to how much the change impacted the Property's value.

On May 6, 2013, this Court denied relief from stay, determining that valuation remained an issue for the confirmation hearing, and noting that Movant should provide a more recent valuation of the Property. The Court concluded at that time that the Property might be needed for an effective reorganization, and there was a plan in prospect (which had not yet been filed but

---

[2] At the time of filing, Debtor also owned other property, including condominium units referred to in prior proceedings as the "Grandview Units." The Grandview Units have since been sold.

[3] The original contract rate of interest on the largest note securing the Property was 7.75%. (Exhibit 4C).

was presented as Exhibit B at that hearing).  The Court, however, also stated that there were several problems with the plan in prospect, and conditioned the continuance of the automatic stay by ordering Debtor to pay Movant the amount it had set aside for adequate protection, and continue to pay Movant $5,000 per month until a plan was confirmed.  Debtor has paid the Movant the adequate protection payments as ordered.

The Debtor's initial plan designated the following classes:

Class 1: Secured  Tax Claims of Jefferson County, Colorado
Class 2(a): Secured Claim of FDIC (Grandview Units–First Deed of Trust)
Class 2(b): Secured Claim of FDIC (Grandview Units–Secured portion of claim under Second Deed of Trust)
Class 3: Secured Claim of FDIC (the Property)–Secured portion of Claim under First Deed of Trust)
Class 4: Unsecured Claims of FDIC (deficiency claims)
Class 5: Administrative Convenience Claims
Class 6: Equity Interests
Class 7: Late filed claims

Under the initial plan,  Debtor would: 1) pay Class 1 secured tax claims on both the Property and the Grandview Units in the amount of $92,469.31; 2) sell the Grandview Units within 90 days after the plan effective date for not less than $600,000; 3) pay the net sale proceeds to the Movant up to the allowed amount of its secured claim under the first deed of trust on the Grandview Units; 4) allow Class 2(b) in an amount equal to the market value of the Grandview Units less the allowed amount of the Class 1 and 2(a) Claims, including interest; 5) allow the secured obligation in Class 3 in an amount equal to the value of the Property ($2,200,000.00); 6) pay this secured obligation from the operation of Debtor's business over a 30-year loan at a 4.5% interest rate, with the entire remaining principal balance due in full seven years following the effective date; 7) pay allowed Class 4 claims from the Net Profits fund and Class 5 Claims at 50% of their allowed amounts; 8) infuse a $100,000 capital contribution as new value in exchange for 100% of the equity interests in the reorganized debtor, to pay the Class 1 and 5 claims and to fund ongoing operations; and 9) if the Property is sold, pay 25% of the net proceeds from the sale to the Net Profits fund for distribution to the allowed Class 4 claims holder, with the remaining 75% to be distributed to equity holders in the reorganized Debtor.

Debtor filed its initial plan of reorganization on May 1, 2013, and its first amended plan of reorganization on June 12, 2013.   The amended plan (the "Plan") proposed that, with respect to Class 3, the Court would determine the value of the Property, and the claim would be treated as a secured obligation in an amount equal to that value.  The claim would then be paid in one of two ways: (1) the reorganized debtor would obtain exit financing in an amount sufficient to refinance the secured claim in the amount determined by the Court ("Option 1"); or (2) the

reorganized debtor would pay the amount of the secured claim from the proceeds of the operation of Debtor's business ("Option 2"). Specifically under Option 2, the reorganized debtor would make interest-only payments at a rate of 4.5% for seven years following the Effective Date, when the entire remaining balance of the secured portion of the claim would be due in full. The unsecured deficiency amount would be included in Class 4. Class 4 claims would be paid 50% of the reorganized debtor's net profits for five years. Class 5 claims (administrative convenience claims) also would be paid at 50%. With respect to Class 6 (equity interests), the capital contribution was increased to $200,000, under Option 1, in exchange for 100% of the equity interests in the reorganized debtor. (The capital contribution remained at $100,000 under Option 2). The capital contribution would also serve as the initial stalking horse bid, with any other creditor or party in interest able to provide new consideration with a minimum amount of $160,000 above the capital contribution. Finally, if Debtor exercised Option 1, then in the event the Property were sold within one year of the Effective Date, the reorganized debtor would pay 100% of any amount realized from the net sale amount in excess of the allowed amount of the Class 3 claim to the Class 3 claim holder. Under Option 2, if the Property were sold, after the Effective Date during the life of the Plan, the reorganized debtor would pay 50% of the net proceeds to the net profits funds for distribution to the Class 4 claim holder, and 50% to the Class 6 equity interests.

Prior to the November 22, 2013, evidentiary hearing, the parties filed a pretrial stipulation, whereby the parties agreed on the following:

- The Grandview Units were sold for $597,096.18, and the net sale proceeds were paid to the Class 2(a) and (b) Claim holder.
- The allowed amount of the  Class 2(a) secured Claim was paid in full at $346,086.48; the remainder of funds ($251,009.70) determined the amount of the Class 2(b) secured Claim, leaving a deficiency claim in the amount of $91,383.35, which Claim is treated in Class 4.
- The Debtor's Plan complies with § 1129(a)(4) and (a)(5).
- § 1129(a)(6) is not applicable.

The parties agreed there were three contested issues of fact at the heart of the dispute with respect to confirmation of the Debtor's Plan: (1) the value of the Property as of November 22, 2013; (2) the reasonable market rate of interest for secured debt; and (3) whether the Debtor's Plan is proposed in good faith. The parties also agreed that, based on those findings, the Court would further need to determine:

- Whether the terms proposed for the restructured loan are fair and equitable;
- Whether the capital contribution by the Jehn family that is proposed in exchange for the equity in the reorganized debtor is a contribution of new value that is "substantial, necessary to the success or reorganization, and equal to or exceeding the value of the estate," consistent with the absolute priority rule;

- Whether the Plan provides sufficient opportunity for others to obtain equity in the reorganized debtor;
- Whether, if the Debtor elects to treat Class 3 under Option 2, the reorganized debtor will be able to make required payments on a restructured loan (feasibility); and
- Whether the Plan's classification scheme "does not discriminate unfairly" and provides "fair and equitable treatment" to the dissenting Classes that are impaired under the Plan.

## II. DISCUSSION

Movant moves for relief from stay under 11 U.S.C. § 362(d)(2), or, in the alternative, § 362(d)(1). Section 362(d)(2) provides:

> On request of a party in interest and after notice and a hearing, the court shall grant relief from the stay provided under subsection (a) of this section, such as by terminating, annulling, modifying, or conditioning such stay . . . with respect to a stay of an act against property under subsection (a) of this section, if –
>> (A) the debtor does not have an equity in such property;
> and
>> (B) such property is not necessary to an effective reorganization.

11 U.S.C. § 362(d)(2).

Movant established and the Debtor's valuation amount demonstrates that the Debtor lacks equity in the Property. Upon that showing, the burden shifts to Debtor to show that there is "'a reasonable possibility of a successful reorganization within a reasonable time.'" *United Sav. Ass'n v. Timbers of Inwood Forest Assoc., Ltd.*, 484 U.S. 365, 376 (1988). "What this requires is not merely a showing that if there is conceivably to be an effective reorganization, [the] property will be needed for it; but that the property is essential for an effective reorganization *that is in prospect.*" *Id.* (Emphasis in original). If evidence indicates that a successful reorganization within a reasonable time is impossible, the court must then grant relief from the automatic stay. *Id.* at 376.

In assessing whether a debtor can prove "a reasonable possibility of a successful reorganization within a reasonable time," courts generally apply a lesser standard in determining whether the debtor has met its burden during the 120–day exclusivity period. *See In re Apex Pharm., Inc.*, 203 B.R. 432, 441 (N.D.Ind.1996). This lesser standard has been referred to as the "sliding scale" burden of proof. However, "the use of the 'sliding scale' burden of proof is intended to benefit debtors who have a realistic chance of reorganization but who have not had sufficient time to formulate a confirmable plan." *Id.* at 442 (emphasis added). When relief from

stay is requested near the expiration of the exclusivity period, the "sliding scale" or "moving target" burden of proof requires a greater showing than "plausibility." *In re Holly's, Inc*., 140 B.R. 643, 702 (Bankr. W.D. Mich. 1992). Rather, "a debtor must demonstrate that a successful reorganization within a reasonable time is 'probable.' " *Id.* "Probable" has been defined as having more evidence for than against, or supported by evidence which inclines the mind to believe, but leaves some room for doubt, or 'likely.'" *In re Gunnison Center Apartments, LP*, 320 B.R. 391, 402 (Bankr. D. Colo. 2005), citing BLACK'S LAW DICTIONARY 1201 (6th ed.1990).

Debtor filed this Chapter 11 case on June 1, 2012, and several motions to extend the exclusivity period were granted, the latest of which extended the 120- day period to May 1, 2013. Debtor filed its first Chapter 11 plan on that date. As previously noted, Movant's first motion for relief from stay was filed in February 2013. The Court held a hearing on that motion in April 2013, entered its order denying relief from stay, and ordered adequate protection payments shortly thereafter. Debtor's Amended Plan was filed on June 12, 2013, which drew a second motion for relief from stay from the lender. Debtor had over a year to develop a plan; and therefore it is time for Debtor to overcome a higher hurdle, and show that a successful reorganization within a reasonable time is probable.

A.  Valuation

To determine whether the Property is essential for an effective reorganization, the value of the Property must be determined. At the November 22, 2013, hearing, Ms. Keene testified that she had re-evaluated the Property's value as of August 1, 2013, and her new appraisal was admitted as Exhibit 1A. In the appraisal, she noted that the Property was 95% leased and occupied, with Jehn Engineering occupying 8,000 square feet of the 23,472 net rentable square feet. She arrived at a fee simple value of $3,055,000, and a leased fee value of $2,610,000. The fee simple value assumed that the 8,000 square feet would be leased at a market rate. The leased fee value assumed that Jehn Engineering would continue to lease the 8,000 square feet at a below market rate.[4]

Debtor's expert witness, Mr. Schneider,[5] testified that in his opinion as a real estate broker, using comparative market sales, the Property was worth $2,200,000, and using an income approach to value, the Property was worth between $2,200,000 and $2,300,000.

---

[4] Ms. Keene testified that the market rate was $18 per square foot, and Jehn Engineering was paying $9.90 per square foot.

[5] Movant objected to Mr. Schneider's testimony based on bias and the Court took that objection under advisement. Because the Court has determined, on other grounds, to accept Ms. Keene's valuation rather than Mr. Schneider's valuation, the objection is now moot.

During his testimony, Mr. Jehn advised that he anticipated increasing the rent that Jehn Engineering paid to Debtor from $6,000 per month to $10,000 per month by February 2014. Ms. Keene then testified that her revised valuation of the Property, considering the Jehn lease at $10,000 per month, would be $2,955,000.

Valuation of a creditor's secured claim differs depending on the purpose and circumstances for which it is undertaken. *In re Stembridge*, 394 F.3d 383, 386 (5th Cir. 2004). In *Associates Commercial Corp. v. Rash*, 520 U.S. 953 (1997), the Supreme Court considered how to value collateral retained by a Chapter 13 debtor exercising the cram down option in § 1325(a)(5)(B) of the Code. The Court distinguished that option from the alternative available to the Chapter 13 debtor, in which its collateral would be surrendered, when deciding the proper valuation standard under § 506(a). *Id.* at 962. When a debtor elects "to use the collateral to generate an income stream" as in a cram down, the Court noted, the use of a foreclosure-value standard would be improper because "a foreclosure sale ... will not take place." *Id.* at 963. The Court thus held that "under § 506(a), the value of property retained ... is the cost the debtor would incur to obtain a like asset for the same 'proposed use,' " i.e., its replacement value. *Id.*

Courts have recognized that similar reasoning applies with equal force in the Chapter 11 reorganization context. *See, e.g., In re Mayslake Village–Plainfield Campus, Inc.*, 441 B.R. 309, 320 n. 2 (Bankr.N.D.Ill.2010) ("The same [replacement] value can be used in this matter, even though a Chapter 11 cram down plan is involved."). Where a Chapter 11 plan of reorganization provides for a debtor to retain and use collateral to generate income with which to make payments to creditors, a § 506(a) valuation based upon a hypothetical foreclosure sale would not be appropriate, as it would be inconsistent with the provision's dictates. *In re Heritage Highgate, Inc.* 679 F.3d 132, 141 (3rd Cir. 2012).

In his appraisal, Mr. Schneider reviewed a number of office buildings that had sold within the prior year. The buildings had been built in the late 50s, mid- 80s, mid-90s, 2004, and 2006. He concluded that, on average, those buildings had sold for less than replacement value, "considerably below $100 per square foot." He noted that "there was an unusually high office vacancy rate in the West Metro Area which is estimated to be in the area of 15%." Mr. Schneider determined that the Property was worth $2,200,000 using a comparative market sales approach to value. He also valued the Property using an income approach to value. He stated that, because the tenants in the Property were not "national credit tenants," the capitalization rate was in the 9.5 to 10% range. He used a vacancy and credit loss factor of 15% and a projected range of $18 per square foot, with operating expenses of $6 per square foot. He opined that using the income approach, the value of the Property was between $2.2 million and $2.3 million.

Ms. Keene's valuation included an analysis of the Metro Denver area and the neighborhood where the Property is located. She opined that the commercial real estate market reflected rising rents, by 3 to 5%, in 2013, and decreased vacancy rates. She specifically examined the vacancy rates within a three-mile radius of the Property and noted that the rates

had trended downward since 2011.  Ms. Keene further noted that a rail line, two blocks south of the Property, was scheduled to open its Gold Line expansion in 2016.  Just south of the rail line were new improvements such as a multi-screen movie theater and several big box stores.  Ms. Keene stated that, while vacancy rates in the Northwest Denver office market generally were 15%,  vacancy rates within a three-mile radius of the Property were only 9%.

Like Mr. Schneider, Ms. Keene valued the Property using a sales comparison approach and an income approach.  She categorized the Property as Class C construction, Investment class B, with  LEED silver certified improvements.  The comparable buildings she selected were similar in construction and built in the late 90s and 2000s, with the oldest comparable built in 1997.  Her sales comparison approach yielded a value of $3.4 million.  However, she recognized that lease-up costs would change the value to $3.2 million, and that the "as is" value of the Property was $2.9 million.  Using an income approach, Ms. Keene analyzed the rent roll for the Property and noted that the average rent rate was $15.68 per square foot, whereas the prevailing market rate in the immediate area was $18 per square foot.   She determined the value of the Property using the income approach to be $3,055,000 fee simple value (using the $18 per square foot figure) and $2,610,000 leased fee value (assuming the current lease rates).

After a thorough review of both valuations, the Court accepts Ms. Keene's valuation.  Ms. Keene is a Managing Director of Butler Burgher Group and has been appraising commercial real estate since 2000.  Her valuation considers important aspects of the Property, such as its newer construction, LEED certified features, and location in an area likely to increase in investment value. Her valuation most accurately  considered the use of the Property, rather than its liquidation value. Mr. Schneider, as a certified real estate broker, focused primarily on the liquidation value of older properties that were not as comparable to the Property in construction and location.

Therefore, the Court determines the value of the Property to be $2,955,000.  This is the amount Ms. Keene testified to at trial, after considering Mr. Jehn's testimony that he anticipated increasing the rent that Jehn Engineering paid to Debtor.  Thus, according to the Plan terms, the value of the Movant's secured claim in Class 3 is $2,955,000.  At trial, Debtor provided evidence of a loan commitment from Mr. Ted Blank for a five-year loan in the amount of $2,200,000, at a rate of 6%,[6] to enable exit financing under Option 1 of the Plan.  Because the commitment is not enough to refinance the Movant's Class 3 secured claim, Option 1 fails.  As a result, it is necessary to determine whether, under Option 2, the proposed terms for the restructured loan are fair and equitable.

---

[6] The stated rate in the commitment letter was "6% 3 year adjustable, adjusting to prime plus 2.75% in 3 years," with estimated monthly principal and interest payments of "about $13,000.00 with the remaining principal and accrued interest due at maturity."  The letter also required a loan fee of $22,000.00 and a $100,000 escrow payment account.

B.      Interest Rate Analysis for Proposed Restructured Secured Loan

At trial, Mr. Richard W. Ferrell, Movant's expert witness, opined that the appropriate interest rate for a cram down of the Movant's secured claim was at least 8%. This rate was determined using the prime plus formula[7] in *Till v. SCS Credit Corp.*, 541 U.S. 465 (2004). The Plan asks the Court to approve a restructured loan at 4.5% for a seven-year term, interest-only payments, with a balloon payment at the end of the term. Mr. Ferrell opined that the proposed interest rate was insufficient to compensate Movant for the risk of non-payment and to ensure that Movant received payments of a present value at least equal to the value of the secured claim.

To give a creditor the present value of its allowed claim, deferred cash payments must be valued as of the effective date of the plan, and must "consist of an appropriate interest rate and an amortization of the principal which constitutes the secured claim." *In re VDG Chicken, LLC*, 2011 WL 3299089, *7 (B.A.P. 9th Cir. 2011). To determine an appropriate interest rate, *Till* requires the "formula approach" that starts with a standard measure of risk-free lending, such as the Prime Rate, and adds an upward adjustment based on the debtor, the plan, and the security for the loan. *Till,* 541 U.S. at 479. The evidentiary burden for establishing an appropriate interest rate under *Till* falls "squarely on the creditors." *Id.*

The Plan, under Option 2, proposes to pay the Movant's Class 3 secured claim from the proceeds generated by the operation of Debtor's business. Debtor proposes to pay interest-only payments, at an interest rate of 4.5%, with a balloon payment due in seven years. Movant argues that this treatment is not "fair and equitable" because this interest rate does not reflect the risk factors inherent in the loan and, thus, does not include the necessary upward adjustment required by *Till*. Under *Till*, the interest rate must take into account the risks to the Movant, given that lenders will not generally lend on a 100% loan-to-value ratio. The Movant contends that the risk of non-payment in this case is much greater than in other cases in which bankruptcy courts approved higher cram down rates, citing *In re VDG Chicken*, 2011 WL at *8 (6% interest rate appropriate given 70% loan to value ratio); *In re Red Mountain Mach. Co.*, 448 B.R. 1, 12-13 (Bankr. D. Ariz. 2011) (6.5% interest rate appropriate); and *In re Nw. Timberline Enters., Inc*., 348 B.R. 412, 434 (Bankr. N.D. Tex. 2006) (*Till* rate of interest for gas station/convenience store bankruptcy held to be prime plus 5.75% to provide fair and equitable treatment to secured lender).

---

[7]  In *Till,* the Supreme Court considered four approaches to selecting the appropriate interest rate: the formula rate, the coerced loan rate, the presumptive contract rate, or the costs of funds rate. A plurality determined that the formula rate was appropriate. The dissent stated that the contract rate (which adjusts the pre-bankruptcy contractual rate to adjust for changed circumstances) should be used to determine what interest rate a cramdown plan should apply to a secured creditor.

Because *Till* was a Chapter 13 case, there is some ambiguity about the correct approach for calculating interest rates under a Chapter 11 plan. *See* Gary W. Marsh and Matthew M. Weiss, *Chapter 11 Interest Rates After Till*, 84 Am. Bankr. L. J. 209 (Spring 2010). In footnote 14 of *Till*, the Supreme Court noted that "a coerced loan rate" may be appropriate in Chapter 11 because "numerous lenders advertise financing for Chapter 11 debtors in possession." In *Bank of Montreal v. Official Comm. of Unsecured Creditors (In re American Home Patient, Inc.),* 420 F.3d 559 (6th Cir. 2005), the Sixth Circuit evaluated *Till's* footnote 14 and created a two-step process to determine the appropriate interest rate in a Chapter 11 case. First, a court should assess whether an efficient market exists. If so, the court should apply the market rate. If not, the court should apply *Till's* prime-plus formula rate. Numerous courts have used this two-step process in a Chapter 11 context.[8] However, as the Fifth Circuit recently noted, "While courts often acknowledge that *Till's* Footnote 14 appears to endorse a 'market rate' approach under Chapter 11 if an 'efficient market' for a loan substantially identical to the cramdown loan exists, courts almost invariably conclude that such markets are absent." *In re Texas Grand Prairie Hotel Realty, L.L.C.*, 710 F.3d 324, 333 (5th Cir. 2013).[9]

Mr. Ferrell testified that an efficient market did not exist for an "under-secured and overleveraged loan" like that proposed in the Plan. Nevertheless, he opined that an interest rate using a "blended rate" approach, involving an analysis of loans in other Chapter 11 cases, would be in excess of the 8% rate he identified using the *Till* analysis. A *Till* analysis considers: 1) the circumstances of the estate; 2) nature of the security; 3) plan feasibility; and 4) loan term. Using this analysis, Mr. Ferrell started with the prime rate of 3.25%, and added 4.75%, for the specific risk factors, arriving at an interest rate of 8%.

This Court notes that, among the courts that follow *Till's* formula method in the Chapter 11 context, "risk adjustment" calculations generally have ranged between 1% and 3% above the prime rate. *See Pamplico*, 468 B.R. at 794 ("[T]he general consensus among courts is that a one to three percent adjustment to the prime rate is appropriate, with a 1.00% adjustment

---

[8] *In re Nw. Timberline Enters.*, 348 B.R. at 412 (applying prime-plus formula after concluding that the evidence was insufficient to establish the existence of an efficient market); *In re Pamplico Highway Dev., LLC*, 468 B.R. 783, 795 (Bankr. D.S.C. 2012); *In re Walkabout Creek Ltd. Dividend Hous. Ass'n Ltd.*, 460 B.R. 567, 574 (Bankr. D.D.C.2011); *In re 20 Bayard Views, LLC*, 445 B.R. 83,106 (Bankr.E.D.N.Y.2011); *In re Hockenberry*, 457 B.R. 646, 657 (Bankr.S.D.Ohio 2011); *In re Riverbend Leasing LLC*, 458 B.R. 520, 536 (Bankr.S.D.Iowa 2011); *In re Bryant*, 439 B.R. 724, 742–43 (Bankr.E.D.Ark.2010).

[9] The Tenth Circuit has not yet addressed the application of *Till* to Chapter 11 cases, although the Bankruptcy Appellate Panel of the Tenth Circuit has applied *Till* in a Chapter 12 case. *First National Bank v. Woods (In re Woods)*, 465 B.R. 196 (BAP 10th Cir. 2012), *rev'd on other grounds*, _F.3d _ , 2014 WL 630470 (10th Cir. 2014).

representing the low risk debtor and a 3.00% adjustment representing a high risk debtor"); *In re Lilo Props., LLC*, 2011 WL 5509401 at *2 (Bankr.D.Vt.2011) ("The Court starts with the premise that the lowest-risk debtors would pay prime plus 1% and the highest-risk debtors would pay prime plus 3%.").

Mr. Ferrell's suggested increase of 4.75% is higher than the 3% increase that courts generally add to the prime rate in the case of a high-risk debtor.  The Plan's proposed interest rate of  4.5% is just slightly over a 1% increase, which courts have used in cases of low-risk debtors.  This Court determines the *Till* analysis is a starting point to determine the risk category in which the Debtor falls.  For example, in *In re Griswold Bldg., LLC*, 420 B.R. 666 (Bankr. E.D. Mich. 2009), a case in many ways similar to this one,[10] the bankruptcy court accepted a risk adjustment of 5% above prime based on the testimony of an expert who examined each of the *Till* factors and made specific risk adjustments for each of them, including a 2% risk adjustment based on the circumstances of the case and a 3% risk adjustment to reflect his belief that there was a substantial risk of nonpayment because of the lack of feasibility of the debtor's plan.  The bankruptcy court rejected an additional 2% risk adjustment based on the nature of security because the court was not convinced the building securing the loan would deteriorate.

Mr. Ferrell examined each of the *Till* factors and adjusted the interest rate accordingly, as follows:

1.  Circumstances of the Estate

Mr. Ferrell opined that the project to build the Property was undertaken with inadequate equity which left Debtor vulnerable to the 2008 financial melt-down.  Additionally, the success of the project was tied to the success of Jehn Engineering, which was similarly vulnerable.  Jehn Engineering is focused primarily on engineering rather than property management, and enjoys a below-market rate lease with an option to extend at that rate until 2018.  Mr. Ferrell concluded

---

[10]  That case involved a debtor who owned office buildings encumbered by a large amount of debt and a proposed plan calling for a balloon payment with "an unrealistic hope" of being able to pay the lender at the conclusion of the plan.

that the below market lease shifted the economic burden to Movant, and added a .5% upward interest rate adjustment.[11]

### 2.  Nature of the Security

Mr. Ferrell noted that a substantial 1.5% risk premium above the prime rate is associated with loans secured by office building collateral, and that most of those loans are at 70% LTV, not the 100% LTV situation presented here.  Further, the restructured loan is not amortized so there is no proposed repayment of principal over the seven-year term, which increases the risk of non-payment.  Mr. Ferrell determined this factor merited a 1.5% upward interest rate adjustment.

### 3.  Plan Feasibility

Mr. Ferrell's examination of the leases between Debtor and the Property's tenants (Exhibit AA) revealed that only one tenant has a lease extending beyond 2015, with 11 of the 16 tenants leasing on a month-to-month basis with leases expiring at the end of 2013.  Thus, there was significant lease-up risk associated with the Property especially if Debtor's efforts to raise lease rates results in certain short-term tenants to move.  The proposed 4.5% interest rate applied to a $3 million loan amount would require annual debt service payments of $137,745, an amount greater than the Debtor's own projections showed the building leases might generate for payment of Class 3.[12]  Also, Mr. Ferrell noted that the Property would need to appreciate almost 43%, or would require more than the $100,000 equity contribution Debtor proposed, to allow a refinance of the collateral using loan proceeds from a 70% LTV financing upon Plan termination in seven years.  Accordingly, without such enhancements, Debtor's Plan is not feasible and effectively shifts the risk of the Property underperforming to Movant.  Mr. Ferrell added a 1% increase over the prime rate due to this factor.

### 4.  Term

The prime rate generally is used for short-term loans of two to three years.  Here, the seven-year proposed term merited an increase in the rate, especially considering that interest rates are presently at historic lows and are predicted to rise.  Mr. Ferrell added a 1.75% increase over the prime rate for this factor.

---

[11]  With Jehn Engineering's proposed lease adjustment to $10,000 monthly, this .5% arguably can be subtracted.

[12]  Debtor's projections (Exhibit HH) are based on a $2.2 million value of the Property, which at 4.5% interest rate, result in the Debtor's proposed monthly loan payment of $11,147.08, or $133,764.96 per year.

Thus, in Mr. Ferrell's opinion, the cumulative effect of the interest rate adjustments resulted in an 8% appropriate interest rate for the cram-down restructure of the loan on the Property (3.25 + 4.75). Clearly, this is substantially greater than Debtor's proposed 4.5% rate for a restructured loan. The Debtor provided no opposing expert to refute his opinion.

The Court agrees in large part with Mr. Ferrell's *Till* analysis, and believes it is a good starting point to determine the appropriate interest rate in this case. While the Tenth Circuit has not addressed the issue of whether *Till* applies in Chapter 11 cases, this Court agrees with the reasoning of those courts applying *Till*'s rationale in Chapter 11 cases where no efficient market exists. In this case, Mr. Ferrell testified that no efficient market existed. The Court agrees. There was evidence of a $2.2 million loan offer at a 6% interest rate; however, that loan had a five-year, rather than seven-year, term, and there was no indication that the loan would have been offered for a longer term and larger amount. There was no evidence before the Court as to whether this loan was indicative of an efficient market.

The 8% estimated rate is 4.75% over prime, which is substantially higher than the 3% over prime that many courts use with a high risk debtor. The Court will reduce Mr. Ferrell's 8% rate by .5% due to Jehn Engineering's willingness to increase their lease to $10,000 monthly. The Court also will reduce Mr. Ferrell's upward adjustment of 1.5% by .5% under the "nature of security" factor. Mr. Ferrell based his adjustment partly on the "1.5% risk premium associated with loans secured by office building collateral." In this case, however, the particular office building is in a very good location and likely to increase in value. Nevertheless, some percentage of risk adjustment is appropriate given there is no repayment of principal over the seven-year term and given the 100% LTV ratio. The Court believes a 1% adjustment, rather than a 1.5% adjustment, is warranted under this factor. Thus, the Court determines an appropriate interest rate to be 7%.[13]

C.     Good Faith.

Having addressed the valuation and interest rate issues, the Court must consider the third contested issue raised by the parties, whether the Plan is proposed in good faith. "The test of

---

[13] The original contract rate on the largest of the three notes was 7.75%. While the *Till* plurality endorsed the formula approach, the dissent stated it would "instead adopt the contract rate – *i.e.*, the rate at which the creditor actually loaned funds to the debtor – as a presumption that the bankruptcy judge could revise on motion of either party." *Till* at 492. The Court notes the evidence suggests that interest rates have come down slightly since the original loan was made, making a downward adjustment from the contract rate appropriate. Accordingly, using either the formula approach or the presumptive contract rate approach, the appropriate interest rate is generally in the same range, at 7%.

good faith is met if there is a reasonable likelihood that the plan will achieve its intended results which are consistent with the purposes of the Bankruptcy Code, that is, is the plan feasible, practical, and would it enable the company to continue its business and pay its debts in accordance with the plan provisions." *In re Global Water Techs., Inc.*, 311 B.R. 896, 902 (Bankr. D. Colo. 2004)(citing *Travelers Ins. Co. v. Pikes Peak Water Co.*, 779 F.2d 1456, 1459 (10th Cir. 1985)). "There is no hard and fast definition of good faith, but the Court must look to the totality of the circumstances in any given case." *Id.* In this case, pursuant to the parties' pretrial stipulation, an analysis of good faith requires the Court to answer the following:

- Whether the capital contribution by the Jehn family that is proposed in exchange for the equity in the reorganized debtor is a contribution of new value that is "substantial, necessary to the success or reorganization, and equal to or exceeding the value of the estate," consistent with the absolute priority rule;
- Whether the Plan provides sufficient opportunity for others to obtain equity in the reorganized debtor;
- Whether, if the Debtor elects to treat Class 3 under Option 2, the reorganized debtor will be able to make required payments on a restructured loan (feasibility); and
- Whether the Plan's classification scheme "does not discriminate unfairly" and provides "fair and equitable treatment" to the dissenting Classes that are impaired under the Plan.

    1.  New Value

The new value exception means that an interest holder in a Chapter 11 debtor whose plan violates the absolute priority rule may in some circumstances retain the interest because it provides "new value" to the debtor, in the form of new capital or similar contributions. *In re H.T. Pueblo Prop., LLC*, 2011 WL 6962754 (Bankr. D. Colo. 2011) (citing *Bank of America Nat. Trust and Sav. Ass'n v. 203 North LaSalle St. P'ship.*, 526 U.S. 434 (1999)). In *Coones v. Mutual Life Ins. Co. of New York*, 168 B.R. 247 (D.Wyo.1994), the court applied a two-part test to determine whether or not a post-confirmation contribution by a debtor would meet the *Los Angeles Lumber*[14] standard: (1) the new value must represent a substantial contribution; which (2) must equal or exceed the value of the interest in property retained by the debtor.

Under Option 2, Debtor proposes a contribution of $100,000 by the members of the Debtor.  Movant contends that this contribution is not material or substantial, given the amount Debtor owes to Movant.  The Court agrees with Movant.  Debtor is contributing $100,000 in

---

    [14]  The *Los Angeles Lumber* test requires that the contributions be substantial, necessary to the success of the reorganization, and equal to or exceeding the value of the retained interest in the estate. *Case v. Los Angeles Lumber Prod.*, 308 U.S. 106 (1939).

new value for 100% of the equity interests. The Movant receives none of this money, which will most likely be consumed by administrative costs. While the contribution does show a certain level of commitment by the members of the Debtor, it is only 3.4% of the value of the collateral.[15] Some courts have noted that a contribution of less than 4% of the value of the collateral is *de minimus* as a matter of law. *See In re Ambanc La Mesa Ltd. P'ship*, 115 F.3d 650, 655 (9th Cir. 1997) (collecting cases).

The Court also notes that under Option 1, the Debtor's members offered to pay $200,000.00 in new value in order to obtain a $2.2 million loan from Ted Blank, but reduce that to $100,000.00 under the loan restructure of Option 2. The difference is apparently a result of the separate loan costs and the need for larger reserves. Given the lack of equity in the Property, the Debtor's members are paying in $100,000 for an asset that currently has a zero or negative value. The equity interest holders are therefore investing in the potential upside resulting from the appreciation of the Property over time. Should that occur, and the Property is sold during the seven years of the Plan, the equity interest holders and Movant will split the surplus 50/50 based on a $100,000 contribution by the equity interest holders and a $2.1 million unsecured Class 4 Claim held by Movant. Thus, for example, upon a future sale that results in a $200,000 surplus, the equity interest holders will receive a return equal to 100% of their investment in the Debtor, while Movant will receive a surplus distribution equal to 4.8%.

Accordingly, the Court finds that the contribution of new value is not sufficient under the Bankruptcy Code. *See In re Sun Cruz Casinos, LLC*, 298 B.R. 833, 842 (Bankr. S.D. Fla. 2003) ("In essence, from the debtor perspective, the proposed new value is like putting money in the bank. The debtor's principals put the money in, and presumably the value of the [property] will increase which inures to the benefit of the debtor's principals. In the meantime, the secured creditor, who bargained for a first lien position, runs the ultimate risk of the project's failure with no upside potential. Such a result is not fair and equitable and violates the absolute priority rule.")

　　　　2. Opportunity for Others to Obtain Equity

Movant alleges that Debtor has not exposed the investment opportunity in any way. Movant also argues that under the terms of the Plan, potential investors are subject to different conditions that render the competition provisions unfair. For instance, any third-party contribution must exceed the Jehns' contribution by $160,000, resulting in an overbid requirement of 160% of the initial contribution offer. Third-party investors also must provide personal guarantees "if necessary." Debtor responds that the process is intended to ensure that

---

[15] $100,000.00 is 3.4% of $2,955,000.00, the value of the Property as determined by the Court and 4.5% of the Debtor's asserted value of $2,200,000.00. Either value is marginal at best under these circumstances.

"the maximum price that a third party is willing to pay for the equity is, in fact, the cost of obtaining equity," thus maximizing the value to the estate.

The Court finds that the Plan does not provide sufficient opportunity for others to obtain equity. The Plan's overbid and possible guarantee requirements appear to have chilled any bidding in this case. The bid structure sets a standard apparently to maximize any equity contribution by third parties, but in the Court's view it sets a significant hurdle that protects the proposed new equity contribution, keeping it as low as possible. *See Sun Cruz Casinos* at 841 ("plans providing junior interest holders with exclusive opportunities free from competition and without benefit of market valuation fall within the prohibition of section 1129(b)(2)(B)(ii) [the "absolute priority rule"]").

### 3. Feasibility

Section 1129(a)(11) requires a finding that the "[c]onfirmation of the plan is not likely to be followed by the liquidation, or the need for further financial reorganization, of the debtor or any successor to the debtor under the plan." This feasibility requirement "requires courts to scrutinize carefully the plan to determine whether it offers a reasonable prospect of success and is workable." *In re Beyond.com Corp.*, 289 B.R. 138, 145–46 (Bankr. N.D. Cal. 2003) (citations omitted); *see Affiliated Nat'l Bank-Englewood v. TMA Assocs. (In re TMA Assocs.)*, 160 B.R. 172, 177 (D. Colo. 1993). A plan is not feasible where income projections are not based on concrete evidence of financial progress, or are speculative, conjectural, or unrealistic. *In re Merrimack Valley Oil Co., Inc.*, 32 B.R. 485, 488 (Bankr. D. Mass. 1983). The Court should not approve a plan if it depends on successful fulfillment of every assumption of the debtor to be feasible and is "so narrowly constructed that any swing in the assumptions to the negative causes the plan to fail." *In re Cott*, 49 B.R. 570, 571-72 (Bankr. W.D. Mo. 1985). Thus, "[w]here the financial realities do not accord with the proponent's projections or where the proposed assumptions are unreasonable, the plan should not be confirmed." *Lakeside Global*, 116 B.R. at 507.

In determining feasibility, a court should consider (1) the adequacy of the capital structure; (2) the earning power of the business; (3) economic conditions; (4) the ability of management; (5) the probability of the continuation of the same management; and (6) any other related matter which determines the prospects of a sufficiently successful operation to enable performance of the provisions of the plan. *See Teamsters Nat'l Freight Ind. Negotiating Comm. v. U.S. Truck Co., Inc. (In re U.S. Truck Co., Inc.)*, 800 F.2d 581, 589 (6th Cir. 1986); *In re Gulph Woods Corp.*, 84 B.R. 961, 973 (Bankr. E.D. Pa. 1988).

### (1)  Adequacy of Capital Structure

In this case, the Debtor has employed an aggressively leveraged capital structure with inadequate equity, based on the large loan from Bank of Choice . The success of the Property

hinged on the success of that bank and of Jehn Engineering, a related party.  The Plan's 100% LTV and 3.4% new value contribution doesn't change the inadequacy of the capital structure.

> (2)  Earning Power of the Business

Debtor's earning power derives from its lease income, which, as noted above, is variable given the terms of the leases and dependency on the Jehn Engineering lease.  The Court did not have evidence of the earning power of Jehn Engineering.  As noted below, the Debtor's own projections show that its earning power will not adequately cover its Plan obligations.

> (3)  Economic Conditions

The evidence indicates that the economic environment in the Debtor's location should be improving.  However, it also shows that the Debtor does not now or will in the future have sufficient cash flow to take advantage of any coming upswing in real estate values.  Time does not seem to be on Debtor's side.

> (4)  Ability of Management

There was also only limited evidence on Debtor's experience with operating office buildings, but in general, Debtor appeared to be primarily engaged in managing the engineering business rather than acting as a commercial property investor and manager.

> (5) Probability of Continuation of the Same Management

The same management would continue under the Plan.

> (6)  Any Other Related Matter that Determines the Prospects of a Sufficiently Successful Operation to Enable Performance of the Provisions of the Plan

The feasibility of the plan is mainly dependent on this last factor.  "Section 1129(a)(11) requires the plan proponent to show concrete evidence of a sufficient cash flow to fund and maintain both its operations and obligations under the plan." *S&P, Inc. v. Pfeifer*, 189 B.R. 173, 183 (N.D. Ind. 1995).  Based on its review of the Debtor's monthly financial reports (Exhibits I-X) and cash flow projections (Exhibit HH) the Court concludes that the Plan is not feasible. The Court has previously determined the value of the Property is $2,955.000.00 and an appropriate interest rate under the Plan is 7.0%.  A 100% LTV, interest-only restructured loan results in a monthly payment of $17,237.50 or an annual total of $206,850.00.  This is substantially greater than the $11,147.00 monthly payment ($133,764.00 annually) Debtor's Plan proposes given a $2.2 million value.  Even if the Court includes the projected Net Profits interests the Plan contemplates and the Debtor's Cash on Hand as of its last monthly financial

report, the Court finds that the Debtor does not have sufficient cash flow to service the payments to the Class 3 secured claim.[16]  The Court concludes Debtor cannot meet debt service payments at a 7% interest rate applied to a loan for $2,955,000.00.

Further, a plan proposal to extend a matured, recourse, short term loan over a substantially longer term is subject to particularly close scrutiny. *In re Tri-Growth Centre City, Ltd.*, 136 B.R. 848, 852 (Bankr. S.D. Cal. 1992).  In  *In re Investment Company of the Southwest, Inc.*, 341 B.R. 298, 311 (BAP 10th Cir. 2006), the Tenth Circuit BAP observed that:

> When determining whether a plan is feasible, courts often consider a debtor's cash flow projections showing its ability to simultaneously make plan payments and fund projected operations.  The projections must be based upon evidence of financial progress and must not be speculative, conjectural, or unrealistic.  While courts often do not require projections for the same period over which a long-term plan spans, a debtor must still sustain its burden to somehow prove that it will be able to perform all obligations it is assuming under the plan. This is especially true when significant balloon payments are required in years not covered by the projections.

The evidence showed that the Property would need to appreciate almost 43% to allow a refinance of the collateral using loan proceeds from a 70% LTV financing upon Plan termination; or the projected cash flows would have to grow markedly to service the required debt load during the life of the Plan.  The Court determines that such increased appreciation or profitability is too speculative and unrealistic to support confirmation of the Plan.

4. Classification

Movant argues that Jefferson County's tax claim should have either not been classified, or it should not be allowed to vote to accept or reject Debtor's Plan. Movant also contends that Debtor should not have separately classified the Movant's unsecured deficiency claim and the purported Administrative Convenience Claims. Once Classes 4 and 5 are combined, and provided that Jefferson's County's claim is not classified or entitled to vote, the Movant's unsecured deficiency claims are large enough that the unsecured class cannot vote in favor of the Plan.

---

[16] In Exhibit HH, the projected Net Profits for the first year of the Plan (January, 2014 - December, 2014) total $18,787.00.  Debtor's Cash on Hand as of September 30, 2013 (Exhibit X) is $52,451.00.  Even with this additional $71,000.00 source of potential cash, Debtor still has insufficient cash to fully fund the Class 3 payments for the first year of the Plan, much less subsequent years.

(a)  Tax Claim

11 U.S.C. § 507(a)(8) grants priority to certain unsecured tax claims.  Generally claims under this section cannot be classified in a proposed plan.  *In re Sullivan*, 26 B.R. 677, 678 (W.D. Wis. 1983); *In re Gregory Boat Co.*, 144 B.R. 361, 365 (Bankr. E.D. Mich. 1992). BAPCPA added §1129(a)(9)(D), which imposes the same payment for secured priority tax claims under a Chapter 11 plan as for unsecured priority tax claims under § 1129(a)(9)(C) if the claim would otherwise meet the description under § 507(a)(8) but for the secured status of the claim.

Thus, Movant argued in its objection to confirmation (filed July 29, 2013) that the secured priority tax claim of Jefferson County is not impaired, and therefore, any vote in favor of the plan by Jefferson County should not be used to effectuate a cram down under § 1129(a)(10).

However, Debtor's ballot summary, filed on August 7, 2013, indicates: "Class 1-Secured Claims of Jefferson County: No vote (not entitled to vote)."  Thus, it would appear that the argument about the classification of the tax claims is no longer relevant.  Regardless of the classification of the tax claim, the classification scheme fails anyway for the reasons set forth below.

(b)  Separate Classification of Unsecured Deficiency Claim

Plan confirmation requires the consent of at least one impaired class, not counting insiders.  For a class to accept a plan, at least two-thirds in amount and more than one-half in number of the allowed claims of the class must vote in favor of the plan. 11 U.S.C. § 1126(c). Insiders' votes are not counted. 11 U.S.C. § 1129(a)(10).  Section 1129(a)(1) provides that a court may confirm a chapter 11 plan only if the plan complies with the applicable provisions of the Bankruptcy Code. *In re Acequia, Inc.*, 787 F.2d 1352, 1358 (9th Cir. 1986). The phrase "applicable provisions" has been interpreted to include § 1122, which governs the classification of claims and interests under a Chapter 11 plan. *See Cal. Fed. Bank, F.S.B. v. Moorpark (In re Moorpark Adventure)*, 161 B.R. 254, 256 (Bankr. C.D. Cal. 1993). Section 1122(a) provides that "a plan may place a claim or an interest in a particular class only if such claim or interest is substantially similar to the other claims or interests of such class."

Debtor placed the Movant's unsecured deficiency claims in a different class as the other five unsecured claims, estimated by Debtor to total no more than $3,609.76. Movant argues that the classification scheme is being proposed by the Debtor for the sole purpose to obtain plan approval under Section 1129 by having an administrative convenience class of claims make up the only impaired, accepting class.  Movant notes that, once the classes 4 and 5 are combined,

Page 19 of 25

Movant's unsecured deficiency claim makes it impossible for the general unsecured class to vote in favor of the Plan.

Debtor responds that § 1122(a) does not mean that all similar claims must be in the same class; it only means that if claims are in a class together, they must be substantially similar, citing *In re Woodbrook Assocs.,* 19 F.3d 312, 317 (7th Cir. 1994). Debtor argues that the claims of the creditors in Class 5 bear no similarity to the claims of the creditors in Class 4, "for the creditor in Class 4 was a sophisticated lender whose claim is a deficiency claim arising from the Bank of Choice's long-term loans to Debtor."

There is no controlling Tenth Circuit law on whether substantially similar claims may be separately classified. *In re Deming Hospitality, LLC*, 2013 WL 1397458 (Bankr. D. N.M. 2013). Seven Circuit Courts impose restrictions on a plan proponent's ability to separate similar claims (Second, Third, Fourth, Fifth, Sixth, Eighth and Eleventh Circuits). *See Boston Post Road Ltd. Partnership v. F.D.I. C. (In re Post Road Ltd. Partnership)*, 21 F.3d 477, 483 (2nd Cir.1994); *John Hancock Mut. Life Ins. Co. v. Route 37 Business Park Assoc.*, 987 F.2d 154, 159–60 (3d Cir.1993); *Lumber Exch. Bldg. Ltd. Partnership v. Mutual Life Ins. Co. (In re Lumber Exch. Bldg. Ltd. Partnership)*, 968 F.2d 647, 649 (8th Cir.1992); *Travelers Ins. Co. v. Bryson Properties, XVIII (In re Bryson Properties, XVIII)*, 961 F.2d 496, 502 (4th Cir.1992); *Phoenix Mut. Life Ins. Co. v. Greystone III Joint Venture*, 995 F.2d 1274, 1278–1279 (5th Cir.1991); *Olympia & York Florida Equity Corp. v. Bank of N.Y. (In re Hollywell Corp.)*, 913 F.2d 873, 880 (11th Cir.1990); *Teamsters Nat'l Freight Indus. Negotiating Committee v. U.S. Truck Co. (In re U.S. Truck Co.)*, 800 F.2d 581, 586 (6th Cir.1986).

The Seventh Circuit is the only Circuit to hold otherwise. In *In re Woodbrook Associates*, that court held that §§ 1111(b) and 1122(a) required separate classification of an unsecured deficiency claim from the general unsecured claims in the debtor's plan. The court reasoned that a § 1111(b) creditor would receive no distribution on account of its deficiency claim in a Chapter 7 liquidation; therefore, it would be anomalous for such a creditor to hold up a Chapter 11 confirmation by demanding that it receive the same payment made to general unsecured creditors. The court also opined that if general unsecured creditors were included in the same class as the deficiency claimant, they could control the vote as to whether the secured creditors should forego their deficiency claim and instead elect fully secured status. *See Id.* at 318-319.

The reasoning of the Seventh Circuit has been criticized. In *In re JRV Indus., Inc.*, 342 B.R. 635,638 (Bankr. M.D. Fla. 2006), the court noted that "the Seventh Circuit Court of Appeals has held that because deficiency claims of non-recourse claimants that become recourse pursuant to § 1111(b) would not exist outside of a bankruptcy case, the claims are so dissimilar to general unsecured claims that they mandate separate classification." However, the "alleged distinction" arises under state law, which is "irrelevant where, as here, the Code has eliminated

the legal distinction between non-recourse deficiency claims and other unsecured claims." *Id. (citing Phoenix Mut. Life Ins. Co v. Greystone III Joint Venture*, 995 F.2d 1274, 1278–1279 (5th Cir.1991)). In any event, Movant here did not elect § 1111(b) treatment prior to the approval of Debtor's Disclosure Statement, nor did the Plan provide that treatment as an option.

In *Deming Hospitality*, the New Mexico bankruptcy court noted, "the main judicial gloss on § 1122(a) is that the subsection prohibits a debtor from separately classifying similar claims to "gerrymander" a consenting class." *Deming*, 2013 WL at *2. If a creditor objects to the classification scheme on gerrymandering grounds, most courts require the plan proponent to justify the classification. *See In re Barakat*, 99 F.3d 1520, 1526 (9th Cir.1996) (business or economic justification required); *In re Heritage Organization, LLC*, 375 B.R. 230, 303 (Bankr.N.D.Tex.2007) (discussing when separate classification justified). See also *In re City of Colorado Springs Spring Creek General Imp. Dist.*, 187 B.R. 683, at 688, n. 4 (collecting cases).

The *Deming* court adopted the "one clear rule" against gerrymandering to satisfy § 1129(a)(10), whether the source of the rule is § 1122(a) or § 1129. The court reasoned as follows:

> Since the plan proponent has the burden of proving compliance with § 1129 in any event, the court placed the burden on the plan proponent to justify any separate classification of substantially similar claims, if a party in interest objects on gerrymandering grounds. If the plan proponent carries its burden of showing that substantially similar claims were not separately classified to gerrymander a consenting class of impaired claims, the Court will make no further inquiry into whether the separate classification of similar claims violates § 1122(a); any remaining confirmation issues would be addressed under § 1129. Analyzing separate classification objections in this way protects creditors from gerrymandering and/or other improper classification attempts, while not taking undue liberties with the text of § 1122(a).

This Court agrees with much of the *Deming* analysis. The Court is not troubled by Debtor's assertion that § 1122 does not prohibit putting even similar claims into different classes. But, Debtor did not provide any justification for separately classifying the Movant's unsecured deficiency claim, other than stating that the claims are "different" and that Debtor is unable to pay all unsecured claims in full with interest. There are only a few unsecured creditors; namely, Cintas, Huddleston Brothers Plumbing, the Town of Frederick, Western States Fire Protection, and Public Service Company of Colorado. These claims total only $3,609.76 and as class 5 creditors they will be paid fifty (50) percent of their claim within sixty (60) days of the Effective Date. The Debtor's members will be paying up to $100,000 in "new value" to retain their interests and, as the Court has noted previously, Debtor reported more than $52,000.00 in Cash on Hand within two months of the confirmation hearing. However it appears

that Debtor will not use an additional $1,804.88 from these funds to pay in full the Class 5 administrative convenience class.  In the Court's experience, convenience classes are generally used by a plan proponent to clear out numerous small claims soon after plan confirmation.  This eliminates the need to pay small, periodic pro rata divided checks to such creditors.  It is truly an administrative convenience to do so.  Given the small number of general unsecured claims the Debtor has placed in Class 5, the Court concludes that Debtor's classification artificially impairs those claims and gerrymanders the vote to obtain an accepting class.  But, even if the Court did not decide whether the Debtor has gerrymandered the unsecured classes and would allow the classification, the Court finds another flaw in the Plan's treatment of creditors.

(c)      Unfair Discrimination; Fair and Equitable

Section 1129(a) and (b) set forth the minimum requirements a plan must satisfy to be confirmed. If the plan does not satisfy these requirements, the court cannot confirm the plan. *See In re Ambanc La Mesa Ltd. P'ship*, 115 F.3d 650, 653 (9th Cir. 1997) (stating that courts have an affirmative duty to ensure all confirmation requirements are met).  Debtor, as the Plan's proponent, carries the burden of proof in showing that all the requirements for confirmation set forth in § 1129 are satisfied. *See In re Briscoe Enter., Ltd.*, 994 F.2d 1160 (5th Cir. 1993).  Debtor must prove by a preponderance of the evidence that: (a) the Plan satisfies all confirmation requirements, or (b) that the only condition not satisfied is the requirement that all impaired classes accept the Plan, and, if so, that the Plan must satisfy the cram down alternative, which requires that the Plan not discriminate unfairly against objecting impaired classes and is fair and equitable towards each objecting class.  *In re Ambanc*, 115 F.3d at 653.

Regardless of the classification scheme, § 1129(b)(1) provides that a plan must be fair and equitable and cannot discriminate unfairly.  To determine whether a plan discriminates unfairly, courts have considered: (1) whether the discrimination is supported by a reasonable basis; (2) whether the debtor can confirm and consummate a plan without the discrimination; (3) whether the discrimination is proposed in good faith; and (4) the treatment of the classes discriminated against.  Other courts have used a "rebuttable presumption" test or "Markell" test, which is met by showing that, outside of bankruptcy, the dissenting class would receive less than the class receiving a greater recovery, or that the alleged preferred class had infused new value which offset its gain.  Regardless of the standard used, courts agree that if the treatment of substantially similar claims is "grossly disparate," it is very difficult for the plan proponent to show "fair" discrimination.

The Court cannot find that the Plan's discrimination between Class 4 and 5 is supported by a reasonable basis.  As previously discussed, all unsecured claims, other than Movant's, are put into Class 5, which shall be paid fifty (50) percent of the allowed amounts of their respective claims within sixty (60) days after the Effective Date.  However, the Class 4 claimant (Movant) receives the following: "commencing 30 days after the first anniversary of the Effective Date

Page 22 of 25

and on an annual basis thereafter for five years, the reorganized debtor shall make pro rata payments on each allowed Class 4 Claim from the net profits fund." Should the Property be sold during the Plan, the reorganized debtor shall pay 50% of the net proceeds from the sale into the Net Profits fund, with 50% distributed to Class 4 and the other 50% distributed to the equity holders (Class 6).

The Court concludes that Debtor's proposed treatment of Movant's unsecured deficiency claim is "grossly disparate" to its treatment of other unsecured claims. The Court has already found that the classification and treatment of Class 5 in Debtor's Plan is an attempt to obtain an impaired, accepting class to meet the requirements for a contested plan confirmation to "cram down" Movant's Class 3 and 4 claims. Such artificial impairment does not have a supportable, reasonable basis. Class 5 is paid fifty (50) percent in two months, Class 4 is paid fifty (50) percent of net profits beginning thirteen (13) months after the Effective Date and paid such amount annually for the next five years. This shifts the risks associated with the Debtor's continued operations to the Movant. It is not certain that the Debtor will have net profits from which these annual payments can be made.[17] Also, whether there are net profits will be in the control of the Debtor based upon the expenses and charges it may incur over that six year period. If the Property is sold within that payout period, the Movant and the new Equity Interest will share equally the net proceeds of the sale. The Movant might receive half the net proceeds for an unsecured claim that is in excess of $2 million and the Equity Interests will receive the same amount for their $100,000.00 new value contribution.

Debtor cannot confirm its Plan without this discrimination, because confirmation requires the consent of at least one impaired class. Given that discrimination, since it strongly suggests it was done to gerrymander the classes to obtain an accepting impaired class, the Court finds that the classification unfairly discriminates and is inequitable as to Movant.

Under 11 U.S.C. § 1129(b)(1), the Debtor must show that its Plan is fair and equitable with respect to impaired creditors who have not accepted the Plan. With respect to non-accepting secured creditors whose claims are impaired, the Debtor must show that its secured creditors retain the liens securing their claims and payments totaling at least the allowed amount of their claims, and, if their rights are altered, that secured creditors receive the "indubitable equivalent" of their claims. 11 U.S.C. § 1129(b)(2)(A); *In re Investment Co. of the Southwest*, 341 B.R., at 318. The Plan, under Option 2, proposes to pay the Movant's Class 3 secured claim from the proceeds generated by the operation of Debtor's business. Debtor proposes to pay interest-only payments, at an interest rate of 4.5%, with a balloon payment due in seven years.

---

[17] The Court has also found that Debtor's cash flow is not sufficient to fund the necessary payments on the Class 3 secured claim, even by including the projected Net Profits to do so.

Although Movant retains its lien, the Plan does not pay the allowed amount of Movant's claim.  With regard to Movant's Class 3 secured claim the Plan's assigned value of $2.2 million is too low, the 4.5% interest rate is too low, and the loan is not amortized to reduce the principal balance pending the seven- year payment stream.  As to both its Class 3 and Class 4 claims, the Movant bears the risk of Debtor's nonperformance since the multiple year payout is based upon the Debtor's operation results and projections which the evidence shows are insufficient.  The Court cannot say that Movant is receiving the "indubitable equivalent" of its Class 3 secured claim under the Plan.

Under 11 U.S.C. § 1129(b)(2)(B)(ii), with respect to a class of unsecured claims that is not paid in full, the holder of any claim that is junior to that class cannot receive or retain under the plan on account of such junior claim or interest any property (the absolute priority rule), unless the new value exception is met.  *See Bank of America Nat. Trust and Sav. Ass'n  v. 203 North LaSalle St. P'ship.*, 526 U.S. 434 (1999). The classification of Movant's unsecured deficiency claim in a separate Class 4 is not fair and equitable due to the artificial impairment of Class 5, the discriminatory treatment of Class 4 and Class 5 unsecured claims, and the insufficient amount of new value contributed to the Plan.

## III.  CONCLUSION

This Court must grant relief from stay when there is no equity in the Property and the Debtor has not demonstrated that a successful reorganization within a reasonable time is probable or likely. 11 U.S.C. § 362(d)(2);  *In re Holly's*, 140 B.R. at 702; *Gunnison*, 320 B.R. at 402.  Accordingly, the Court grants Movant's Motion for Relief from the Automatic Stay.[18]

The Debtor has had the opportunity the Code provides to debtors-in-possession to reorganize their affairs.  Debtor's lack of reorganization prospects does not reflect any lack of effort or diligence by its management.  The Court is satisfied that management has pursued whatever reorganization possibilities exist.  Nonetheless, a secured creditor may not be denied leave to exercise its rights for an extended period of time, based only on the hope that the Debtor will be able to gain advantage by a low property valuation and interest rate, by improved profits during the plan, and by refinancing being available at the end of the balloon period.

For all the foregoing reasons, the Court hereby

---

[18] Having granted relief from stay under 11 U.S.C. § 362(d)(2), the Court need not address the alternative relief requested under 11 U.S.C. § 362(d)(1).

**ORDERS** that Movant's Motion is **GRANTED**, and confirmation of the Plan is **DENIED.**

Dated this 3rd day of April, 2014.

**BY THE COURT**

*Howard Tallman*

Howard R. Tallman, Chief Judge
United States Bankruptcy Court